UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROSALBA PALUMBO,<br>               Plaintiff,<br><br>v.<br><br>DUSTIN TESTA, JEANNE VAN PATTEN-STEIGER,<br>THOMAS J. O'LOUGHLIN, and TOWN OF MILFORD,<br>               Defendants. | CIVIL ACTION<br>NO. 14-40051-TSH |

**MEMORANDUM AND ORDER**
**May 27, 2015**

**HILLMAN, D.J.**

### Nature of the Case

Plaintiff, Rosalba Palumbo ("Palumbo"), filed suit against individual Defendants, Dustin Testa ("Officer Testa"), Jeanne Van Patten-Steiger ("Officer Van Patten-Steiger") and Thomas J. O'Loughlin ("Chief O'Loughlin"), and the Town of Milford ("Milford") as the result of injuries she alleges she suffered when she was hit with pepper spray during the course of her son's arrest. Plaintiff has alleged claims: under 42 U.S.C. §1983 for violation of her Fourth Amendment Rights (Count I—Officers Testa and Van Patten-Steiger); under the Massachusetts Civil Rights Act, Mass.Gen.L. ch. 12, §§11H and 11I ("MCRA")(Count II—Officers Testa and Van Patten-Steiger); for Negligent Injury and Negligent Infliction of Emotional Distress (Count III--Milford); Assault and Battery (Count IV—Officers Testa and Van Patten-Steiger); Intentional Infliction of Emotional Distress (Count V—Officers Testa and Van Patten-Steiger); Conspiracy

(Count VI—Officers Testa and Van Patten Steiger); and under 42 U.S.C. § 1983 against Milford and Chief O'Loughlin for violation of her constitutional rights.[1]

This Order addresses Defendants, Dustin Testa, Jeanne M. Van Patten-Steiger, Chief Thomas J. O'Loughlin And Town Of Milford's Motion To Dismiss Plaintiff's Complaint (Docket No. 6). For the reasons set forth below, the motion is *allowed*, in part, and *denied*, in part.

## Discussion

### *Standard of Review*

Defendants seek to dismiss Counts I, II, VI and VII of the Complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. On a Rule 12(b)(6) motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the plaintiff must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (internal citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if plaintiff's

---

[1] The Complaint contains conclusory and unnecessarily hyberbolic factual assertions regarding the arrest and treatment of Steven Palumbo, the Plaintiff's son. Additionally, pictures of Steven Palumbo in a cell at the Milford Police Department are attached to the Complaint. At the hearing, counsel for Palumbo stated that this information was included in the Complaint because it supports Plaintiff's municipal and supervisory liability claims. Although I am allowing these factual allegations and accompanying pictures to stand, given the extremely tenuous relevance that this information has to Plaintiff's claims and the fact that the information is included with little or no context, I am troubled by their inclusion in the Complaint and, more particularly, the decision to present the information in such an inflammatory manner.

well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm.*, LLC, 521 F.3d 76, 84 (1st Cir. 2008) (internal quotations and original alterations omitted). "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." *Ocasio-Hernàndez v. Fortuño-Burset,* 640 F.3d 1, 13 (1st Cir. 2011).

## *Facts*

On April 16, 2011, Palumbo, then aged 67 years, got a phone call from her son, Steven Palumbo ("Steven"). Steven told his mother that members of the Milford Police Department had just been served him with a restraining order following a conversation he had with one of his friends, Dustin Morris ("Morris"). Shortly after being served with a restraining order Steven called Morris's mother, Beverly Morris ("Mrs. Morris"), to complain about being served with a restraining order. Palumbo told her son that she would drive over to his house. Mrs. Morris called the Milford Police Department to complain about the phone call from Steven.

Officers Testa, Van Patten-Steiger, and Angel Arce ("Officer Arce") were dispatched to Steven's Parkhurst Street to arrest him for alleged violation of the restraining order. When Palumbo arrived at Steven's house, she found Steven and his girlfriend standing outside. After speaking with Steven for a short time, she went to her vehicle and noticed two vehicles drive in front of her son's property. Palumbo saw Officer Testa in one of the vehicles with another officer. Palumbo asked officer Testa: "Can I help you? What happened now?" Officer Testa asked Palumbo if Steven was home. Palumbo saw Steven walking from the garage steps of his house and she heard him say, among other things, "What did I do now?" Palumbo saw Officer Testa walk towards Steven. Palumbo next saw Officer Testa grab Steven's right hand and place

it behind the back as he walked Steven towards the cruiser. Palumbo saw Officer Testa push Steven's head down onto the hood of the police cruiser.

Palumbo could hear Steven gasping for air and not being able to speak clearly. She stood about 4 feet away from Officer Testa and Steven and next to the front hood of the police cruiser. At that time Officer Testa had not told Steven he was under arrest, nor did he try to put handcuffs on him or give him any orders. Palumbo heard Officer Testa tell Steven "we're here for Beverly." Palumbo heard her son respond: "who said I can't call Beverly [Morris's mother], I call her all the time." Palumbo then saw Officers Arce and Testa force Steven's head onto the hood of the cruiser while holding up his arms towards his back as he repeatedly stated: "What did I do wrong?"

Palumbo, who was unaware the officers were going to place Steven under arrest, moved to a distance of two feet away from her son and the officers. She then placed a portion of her body on the hood of the cruiser and about 10 inches away from Steven. Palumbo saw Officer Van Patten-Steiger to the right of Officer Testa (on the driver side of the cruiser). Palumbo told Steven "we are going to fix it" and then she heard an officer say: "I'm going to spray." Palumbo had no idea what the officer meant by that statement.

Palumbo remembers that both a male officer and a female officers (Officers Testa and Van Patten-Steiger) were present and said "spray" or "we're going to spray." Just before she was sprayed, she saw the two officers standd a bit back from Steven while holding him. No officer ordered or told Palumbo to move and no one attempted to move her in an effort to prevent her from being sprayed.

Palumbo saw an officer extend a hand holding an object toward her face and when

4

the object was about 15 inches she saw and felt a jet of spray directly into both of her eyes. Palumbo then jerked back from the hood of the car screaming "Steven, my eyes, they're burning, Steven help." Steven immediately yelled "how could you this?" "She's 60 years old!" A few seconds later, Palumbo could hear Steven yell, "my eyes, my eyes."

As Palumbo was yelling, "my mouth, my eyes, they're burning awful," she heard a female say "we didn't spray you." Palumbo replied "you sprayed me, my eyes are on fire, they're burning." Palumbo also yelled "I can't breathe." Palumbo heard the female officer reply "It's only a little pepper spray."

Steven, trying to aide his mother, embraced her and they fell to the ground. Steven, whose arms were still free, tried to help Palumbo up from the ground and as he did so an officer yelled: "we're going to tag you." Palumbo then heard what sounded to her like two shots and heard her son moaning on the ground to her right. Palumbo, believing her son had been shot, panicked. No officer came to her assistance as she lay on the ground, gagging and gasping for breath.

After a time, while she was still blinded from the effects of the pepper-spray, two officers lifted her up from the ground and brought her to where Steven's girlfriend was located. Officers eventually called an ambulance, which took Mrs. to the emergency department of Milford Regional Medical Center. Emergency medical technicians of the ambulance service, American Medical Response, wrote that Palumbo stated that she had been sprayed in both eyes with pepper spray. She complained of blurred vision and burning pain, and they found redness and swelling around both eyes. At the Milford Regional Medical Center ("MRMC") emergency department, Palumbo was examined and admitted to the hospital, where she remained until her discharge on

April 19, 2011. Along with her eye complaints she was diagnosed with atypical chest pain secondary to an acute stress reaction.

Palumbo has been treated by various medical professionals for ongoing light sensitivity and a burning feeling and pain in her eyes. She continues to receive treatment. At the time she was sprayed Palumbo was unarmed and non-belligerent and she was never charged with any crime related to the incident of her son's arrest.

At the time of and prior to the incident from which this suit arises, Milford and Chief O'Loughlin had a policy, custom and practice of failing to properly to investigate complaints of misconduct or to discipline those officers who used excessive force. Milford and Chief O'Loughlin also had a policy and/or custom and practice of tolerating a code of silence in which Milford police officers understood that they were not to report incidents of misconduct against fellow officers. Milford and Chief O'Loughlin also observed a custom and practice of making it difficult for citizens to file complaints about the conduct of Milford police officers. Where complaints of unreasonable force were presented, at all pertinent times Milford, Chief O'Loughlin, and the Milford Police Department failed to properly investigate misconduct claims and failed to discipline officers who used unreasonable force.

The Milford Police Department, and in particular Chief O'Loughlin, also failed to monitor officers' use of force by making sure that officers filed use of force reports whenever someone taken into custody had visible injuries. Such injured prisoner reports were at all pertinent times required by state law and by Milford Police Department policies and procedure. Milford Police officers routinely submitted false or incomplete reports that did not report, or which underreported, prisoners' injuries. The Milford Police Department condoned this

6

widespread violation of the Massachusetts Injured Prisoner Statute as well as the Milford Police Department's own internal policies and procedures.

The policies and customs of Milford led MPD officers, including Officers Van Patten-Steiger and Testa, to believe that they could use as much force as they wanted, to believe that they could violate the constitutional rights of its citizens' by using unreasonable force, making arrests without probable cause, filing false reports, and even testifying falsely in court without any level of police sanction.

<em>Whether Plaintiff Has Stated A Claim Under Count I</em>

In Count I of her Complaint, Plaintiff alleges that the actions of Officers Testa and Van Patten-Steiger deprived her of right to be from the use of unreasonable force under the Fourth Amendment. Officers Testa and Van Patten-Steiger assert that because Palumbo was never "seized," her claim does not arise under the Fourth Amendment,[2] rather, her claim arises under the Fourteenth Amendment-- because Palumbo has not pled the elements of a Fourteenth Amendment claim, Count I must be dismissed. In the alternative, Officers Testa and Van Patten-Steiger argue Count I must be dismissed because they are entitled to qualified immunity.

Plaintiff argues that she has properly pled a Fourth Amendment claim. She also argues that the Court should interpret Count I as including a Fourteenth Amendment claim because in Paragraph 2 of her Complaint, she alleges that the Court has jurisdiction over this action because she is alleging claims for violation of the Fourth and Fourteenth Amendment. Plaintiff's latter argument is a non-starter. In Count I, Palumbo expressly alleges that the officers' actions violated the Fourth Amendment and at the hearing, counsel failed to identify any language in

---

[2] At the time of the incident, police officers were responding to a complaint that Palumbo's son had violated a recently issued restraining order. Palumbo was pepper sprayed when standing in close proximity to her son as the police officers were attempting to arrest him. Palumbo was never arrested and never charged with any crime.

Count I which could be interpreted to support a Fourteenth Amendment violation. Therefore, the Court will focus on whether Plaintiff has stated a Fourth Amendment claim.

*Whether Plaintiff Has Stated A Claim For Violation Of her Fourth Amendment Rights*

The Fourth Amendment of the U.S. Constitution provides individuals the right to be free from unreasonable searches and seizures. "[A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement…, nor even whenever there is a governmentally caused and governmentally desired termination of in individual's freedom of movement…, but only when there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. County ov Inyo*, 489 U.S. 596-97, 109 S.Ct. 1378 (1989). Whether Palumbo was seized for purposes of the Fourth Amendment is a question of fact. First, there is the question of whether Palumbo's freedom of movement was terminated after she was pepper sprayed. Second, is the issue of whether the pepper spray was intentionally applied—to her (there is no question that the pepper spray was directly applied to her son.) *See Hamilton v. City of Olympia*, 687 F.Supp.2d 1231 (W.D.Wash. 2009).

This is a close case. If the officers knew that because of Plaintiff's close proximity to her son she would be effected, that is, if they also *intended* to expose her to the pepper spray which they targeted at her son, then she was seized by the officers for Fourth Amendment purposes. However, if Palumbo was not an intended target of the officers, then the fact that she suffered secondary exposure to the pepper spray would not constitute a seizure for Fourth Amendment purposes. *Logan v. City of Pullman*, 392 F.Supp.2d 1246, 1260 (E.D. Wash. 2005), *see also Landol-Rivera v. Cosme*, 906 F.2d 791,795 (1st Cir. 1990)(In determining whether there has been Fourth Amendment seizure, law distinguishes between police action which is directed towards

producing particular result and action which simply causes particular result—thus, police shooting of innocent hostage is not Fourth Amendment seizure of hostage where police bullet was intended to hit robber for purpose of stopping robber's flight). While the *facts* alleged by the Plaintiff suggest that she was inadvertently hit with pepper spray as the result of having positioned herself in close proximity to her son during the course of his arrest, she asserts that the police intended to pepper spray her. At this stage of the proceeding, considering all factual inferences in her favor, I find that Plaintiff has at least stated a plausible Fourth Amendment claim.

*Whether The Individual Defendants Are Entitled To Qualified Immunity*

The doctrine of qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).

> 'Qualified immunity is a judge-made doctrine designed to "balance two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably " ' The doctrine thus protects from liability for civil damages all public officials other than those who, 'from an objective standpoint, should have known that their conduct was unlawful.'
> 
> The qualified immunity inquiry has two parts. A court must decide whether the plaintiff has made out a violation of a constitutional right and, if so, whether the right was clearly established at the time of the violation. This second part, in turn, has two aspects. The first focuses on the clarity of the law at the time of the violation. The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights. The "salient question" is whether the state of the law at the time of the violation gave the defendant fair warning that his particular conduct was unconstitutional.

*Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013)(internal citations and citation to quoted case omitted).

9

Based on the allegations contained in the Complaint, which I must accept as true for purposes of Defendants' motion to dismiss, Plaintiff has alleged facts which *could* support a finding that: (1) the individual officers used excessive force against Palumbo by intentionally spraying her with pepper spray without justification thus violating a clearly established constitutional right; and (2) that they acted unreasonably in doing so. *See Bettencourt v. Arruda,* Civ.Act.No. 10-11487-JGD, 2012 WL 5398475 (D.Mass. Nov. 1, 2012) Therefore, I cannot find as a matter of law that the individual police officers are entitled to qualified immunity. As to *all* of Plaintiff's claims, this issue is more appropriately addressed at summary judgment on a more expansive factual record.

<u>*Whether Plaintiff Has Stated A Claim Under Count II*</u>

Count Two alleges a claim against Officers Testa and Van Patten-Steiger under the MCRA. In order to state a claim under the MCRA, Palumbo must assert facts that would support a finding that her exercise or enjoyment of rights secured by the constitution or laws of either the United States or Massachusetts has been interfered with, or attempted to be interfered with, by threats, intimidation or coercion. *See* Mass. Gen. L. ch. 12, § 11I. The MCRA is the state "counterpart" to Section 1983 and, in general, is coextensive therewith. The primary difference is that to succeed on an MCRA claim, a plaintiff must also show that the violation of rights occurred "by threats, intimidation or coercion." *Bally v. Northeastern Univ.,* 403 Mass. 713, 532 N.E.2d 49, 52 (1989). "A 'threat' means the 'intentional exertion of pressure to make another fearful or apprehensive of injury or harm.' " *Goddard v. Kelley,* 629 F.Supp.2d 115, 128 (D.Mass. 2009)(citation to quoted case omitted). "Intimidation" means putting a person in fear for the purpose of compelling or deterring his or her conduct. *Id.* "Coercion" means application of physical or moral force to another to constrain him to do against his will something he would

10

not otherwise do. *Id.* The direct violation of a constitutional right does not establish a MCRA violation because "it is not an attempt to force someone to do something the person is not lawfully required to do." *Columbus v. Biggio,* 76 F.Supp.2d 43, 54 (D.Mass. 1999). Defendants assert that Palumbo's conclusory allegations that the officers violated her rights under the MCRA "by threats, intimidation, and coercion" are insufficient to state a claim under the MCRA. For the reasons set forth below, I agree.

Palumbo alleges that immediately before the officers sprayed, she had placed herself on the hood of the police cruiser within ten inches of her son. She also alleges that the officers said something to the effect that they are going to spray. Palumbo does not allege that any officer told her to move away from her son or she would be sprayed, nor does she allege that she was sprayed in an attempt to force her away from immediate scene of Steven's arrest. Therefore, while Palumbo has asserted facts which could plausibly support a claim for a direct violation of her constitutional rights, she has not alleged any facts which would support a finding, nor has she adequately pled, that the officers' actions were intended to coerce her into refraining from the exercise of a right or privilege secured by law.[3] For these reasons, Defendants' motion to dismiss Count II of the Complaint is *allowed*. *Accord Bettencourt*, 2012 WL 5398475, at *13 (what is absent from allegations is any pleading that violation was intended to coerce plaintiff into refraining from exercise of right or privilege secured by law).

<u>*Whether Plaintiff Has Stated A Claim Under Count VI*</u>

The wording of Count VI of the Complaint is muddled, however, it appears that Palumbo is alleging that that Officers Testa and Van Patten-Steiger conspired to violate her constitutional rights by filing false police reports and that their actions deprived and hindered her right of due

---

[3] Under the circumstances, it is not necessary for the Court to address whether Palumbo was exercising a right or privilege secured by law when she placed herself on the hood of the cruiser while the police were attempting to arrest her son.

process to seek redress for her injuries. Palumbo asserts her claim under Section 1983. "While conspiracies may be actionable under section 1983, it is necessary that there have been, besides the agreement [among conspirators], an actual deprivation of a right secured by the Constitution and laws. Thus, an allegation of conspiracy to deprive someone of, say, his constitutional right to due process states a claim under § 1983." *Thore v. Howe*, 466 F.3d 173, 179 (1st Cir. 2006)(internal citations and citation to quoted case omitted)(alteration in original). Defendants argue that Palumbo's factual allegations fail to establish either a coercive or concerted activity conspiracy and therefore, this claim must be dismissed.

> 'A civil rights conspiracy as commonly defined is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages."' Thus, '[t]o present an adequate conspiracy claim, there must be allegations of (1) an agreement between two or more state actors ... (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.' Additionally, allegations of a conspiracy under Section 1983 'must ... be supported by material facts, not merely conclusory statements.'

*Williams v. City of Boston*, 771 F.Supp.2d 190, 204 (D. Mass. 2011). The courts have recognized that it often difficult for a plaintiff to allege direct proof of a conspiracy. While it is a close case, at this stage of the proceedings I find that the minimal allegations that Palumbo makes against these officers, *i.e.*, that the both filed false reports, is sufficient to create an *inference* that acted in concert pursuant to an agreement. *See Id.*, at 205.[4]

### *Whether Plaintiff Has Stated A Claim As To Count VII*

Palumbo alleges a claim against Milford under *Monell v. New York City Dep't of Social Services*, 486 U.S. 658, 98 S.Ct. (1978) alleging that the town had a longstanding custom and or

---

[4] Palumbo's Complaint is totally devoid of any facts which would support her conclusory contention that the officers' actions hindered or deprived her of her right of due process. However, Defendants do not seek to dismiss Count VI on this ground and the Court will not do so *sua sponte*. Nonetheless, Plaintiff is on notice that she is pulling an extremely heavy oar with respect to this claim.

12

policy of not investigating "critical incidents" and failing to discipline police officers who injured citizens, thus condoning police misconduct. She further alleges that this custom or policy led Milford police officers to believe that they would not be held accountable for their actions. She makes similar allegations against Chief O'Loughlin to support her supervisory liability claim against him.

> Generally, a municipality 'may be liable under [section 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.' However, municipalities are not vicariously liable under section 1983 for the actions of their non-policymaking employees. They are responsible only for their own unconstitutional acts. Thus, a plaintiff who brings a section 1983 action against a municipality bears the burden of showing that, 'through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.' Such a plaintiff must 'identify a municipal 'policy' or 'custom' that caused the plaintiffs injury.'

*Haley v. City of Boston*, 657 F.3d 39, 51 (1st Cir. 2011). As to Palumbo's claims against Chief O'Loughlin, "the standard for supervisory liability under 42 U.S.C. § 1983 is clear: '[A] supervisory official may be held liable for the behavior of his subordinates only if (1) the behavior of his subordinates results in a constitutional violation, and (2) the supervisor's action or inaction was affirmatively linked to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference.'" *Phillips v. City of Methuen*, 818 F.Supp.2d 325, 334 (D. Mass. 2011)(citation to quoted case omitted).

I agree with Defendants that Plaintiff's Complaint is rife with conclusory legal statements. At the same time, she alleges that Milford officials, in general, and Chief O'Loughlin, in particular, have failed to properly oversee and discipline members of the police department resulting in a police force comprised of rogue and undisciplined officers. Putting aside the bombastic and inflammatory nature of many of Plaintiff's assertions, the underlying factual inferences, *if* true, suggest a disturbing pattern of behavior by Milford officials and Chief

13

O'Loughlin. At this stage of the proceedings, the Court is required to accept her allegations as true and draw inferences in her favor.[5] Therefore, as to her claims against these Defendants with regard to her allegations relating to policies, customs and/or deliberate indifference by failing to appropriately investigate or discipline officers (which would include her allegations of failure to monitor or dismiss officers) who engaged in misconduct, she has stated plausible claims. However, to the extent that she is alleging claims against these Defendants for failure to appropriately hire or train police officers, there are no allegations which would support a *Monell* claim against Milford or a supervisory claim against Chief O'Loughlin and therefore, such claims are dismissed.

## Conclusion

IT IS HEREBY ORDERED that:

Defendants, Dustin Testa, Jeanne M. Van Patten-Steiger, Chief Thomas J. O'Loughlin And Town Of Milford's Motion To Dismiss Plaintiff's Complaint (Docket No. 6) is ***allowed***, in part, and ***denied***, in part, as provided in this Memorandum and Order.

/s/ Timothy S. Hillman
TIMOTHY S. HILLMAN
DISTRICT JUDGE

---

[5] I want to emphasize that the Court is by no means suggesting that Plaintiff's allegations are true—the Court is simply ruling that assuming she can prove her allegations, Plaintiff has stated a plausible claim.